IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TANIKA SMITH, | ) | Case No. 3:21-CV-01151 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Tanika Smith, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Smith challenges the Administrative Law Judge's ("ALJ") negative findings, asserting that the ALJ misevaluated her residual functional capacity ("RFC") limitations for frequent fingering and handling.  Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, or harmlessly erred in doing so, the Commissioner's final decision denying Smith's application for DIB must be affirmed.

I.    **Procedural History**

On May 9, 2019, Smith applied for DIB.  (Tr. 267-270).  She alleged that she became disabled on February 1, 2019 due to: (i) "cardiac issues," (ii) nerve damage in her hand, (iii) muscle weakness in her arm, (iv) numbness in her hand, and (v) a "mini stroke."  (Tr. 287, 290).  The SSA denied her claim initially and upon reconsideration.  (Tr. 175-186, 188-203).

ALJ Patricia Carey heard Smith's case on May 26, 2020 and denied the claim in a September 9, 2020 decision.  (Tr. 16-26, 33-68).  In doing so, the ALJ determined at Step Four of the sequential evaluation process that Smith had the RFC to perform sedentary work, except:

> [Smith] can occasionally climb ramps and stairs, never climb ladders ropes or scaffolds, and can occasionally balance, stoop, kneel, crouch, but never crawl.  She is limited to frequent handling fingering and feeling with her left non-dominant upper extremity.  She is limited to no overhead reaching with her left upper extremity.  She can never work around hazards, such as unprotected heights or moving mechanical parts.  She is limited to occasional exposure to extreme heat.  She is limited to frequent contact with supervisors, coworkers and the general public.  She can occasionally operate a motor vehicle.  She can perform moderately complex tasks, but not at a production rate pace, for example, no assembly line work.  She is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and performed in a stable, predictable work setting.  Any necessary changes need to occur infrequently, and be adequately and easily explained.

(Tr. 21).  Based on vocational expert testimony that a hypothetical individual with Smith's age, experience, and RFC could perform such work as a document preparer, order clerk, and addresser, the ALJ determined Smith was not disabled.  (Tr. 25-26).  On April 13, 2021, the Appeals Council denied further review of the claim, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4).  And, on June 8, 2021, Smith filed a complaint to obtain judicial review.[1]  ECF Doc. 1.

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Smith was born on April 19, 1982 and was 36 years old on her alleged onset date.  (Tr. 287).  She obtained a GED in 2000 and had past work as an assistant manager at a convenience store.  (Tr. 291).

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 7.

B.    **Relevant Medical Evidence**

Smith limited her challenge to the ALJ's assessment of the manipulative limitations in her left hand and related findings; thus, it is only necessary to summarize the evidence related to her left upper extremity.  *See generally* ECF Doc. 10.

From February 1 to February 6, 2019, Smith was hospitalized for complaints of chest pain.  (Tr. 1125-1126).  She noted that she had a history of ischemic heart disease, a prior heart attack, and had four stents.  (Tr. 1126).  After additional testing and examinations, Smith underwent a left heart catherization procedure, which indicated that she had multivessel coronary artery disease.  (Tr. 1075-1125, 1128-1129).

On February 11, 2019, Smith went to Mercy Hospital to undergo a coronary artery bypass procedure, during which no complications occurred.  (Tr. 602-610).  She was evaluated for discharge the following day after being extubated and noted to be in pain, which she indicated was 8 out of 10.  (Tr. 630-631).

On the morning of February 13, 2019, Smith was reintubated.  (Tr. 637-639).  X-rays indicated she had bilateral alveolar infiltrates, and she was placed on lung protective ventilation.  (*See* Tr. 640-652).  While still intubated on February 19, Smith's fever spiked, and she appeared to be having a seizure.  (Tr. 786).  After testing, doctors believed her acute respiratory failure was due to acute pulmonary edema, and the impression was she had clinical seizure activity potentially caused by the presence of many metabolic derangements.  (Tr. 788, 793).  She remained intubated until February 22, 2019, at which point she was no longer sedated and started using less intrusive assistive breathing devices, such as a nasal cannula.  (*See* Tr. 862-863, 873, 899-949).  On February 25, 2019, she also reported that she had 10 out of 10 pain in her left arm.  (Tr. 955).  The following day, she had a stent placement procedure and, after that, had no active

3

complaints.  (Tr. 986, 1001).  On March 2, 2019, Smith was discharged to Tiffin Rehabilitation Center.  (Tr. 1066).

From March 2 to March 9, 2019, Smith was seen at the Tiffin Rehabilitation Center for hypertension.  (Tr. 373, 593).  Initially, the therapist noted that Smith completed exercises that required lateral pinching, tip-to-tip pinching, and hand and finger strength on both hands, and she was working to increase her activity tolerance to increase participation with feeding tasks. (Tr. 388).  The therapist also noted that Smith expressed frustration with the difficulty she had in performing self-care tasks and reported numbness in her left-hand fingers.  *Id*.  As her sessions progressed, Smith began reporting numbness, tingling, and pain (3 out of 10) in her left hand. (Tr. 390-392).  She was noted on discharge as having made consistent progress.  (Tr. 398).

On March 12, 2019, Smith was seen at her cardiologist's office, and it was noted that she'd had left hand numbness since her procedure.  (Tr. 426).  Smith was instructed to see her neurologist about her hand.  (Tr. 427).

On March 13, 2019, Smith had outpatient therapy, complaining of left-hand numbness and contact pain that was 4 out of 10.  (Tr. 581-582).  The therapist observed that Smith had problems with pain, range of motion, edema, strength, functioning, an open wound, coordination, and sensation, and she had increased swelling on her left hand.  (Tr. 583).  The therapist noted that Smith exhibited signs/symptoms consistent with carpal tunnel/median nerve distribution.  *Id*.

On March 18, 2019, Smith had a follow-up appointment with the stroke clinic, which noted on physical examination that she had normal muscle strength in her extremities and normal sensory decrease in the left medial distribution in her left hand.  (Tr. 578-580).

On March 26, 2019, Smith had a follow-up appointment with her neurologist's office and reported that she had continued pain of 8 out of 10 in her left hand and associated weakness.

4

(Tr. 567-568).  On examination, her extremities were noted as normal, specifically having 5 out of 5 strength in all four extremities and intact sensory functioning.  (Tr. 571).  She was assessed with left distal paresis with associated dysesthesias in her hand.  *Id.*

From March 27 to May 3, 2019, Smith continued with outpatient occupational therapy. (Tr. 512-563).  Smith consistently reported pain in her left hand that was 5 to 7 out of 10 and described it as numbing, tingling, throbbing, and sometimes sharp and shooting.  *Id.*  She, generally, reported being unable to hold items in her hand due to decreased sensation or persistent numbness in her left hand.  (Tr. 511, 522, 537, 540, 542, 546, 550, 557, 561).  The therapists noted that she, generally, tolerated the treatment well or was improving in her condition.  (Tr. 514, 519, 524, 528, 533, 534, 537, 539, 543, 547, 552, 554, 560, 563, 565).

On April 30, 2019, during her therapy sessions, Smith saw her neurologist.  (Tr. 1979). She completed an upper extremity questionnaire before undergoing an electromyography ("EMG") report, indicating that she had shooting pain in her left hand and in her thumb, index, and middle fingers.  (Tr. 1979-1980).  The EMG study indicated her left-hand median area and motor potential had reduced amplitude and conduction velocity.  (Tr. 1984).  A needle study of her left upper extremity also demonstrated "2+ fibrillation" potential in one of her hand muscles, but the rest of her muscles demonstrated normal appearing motor units.  *Id.*  In conclusion, the study indicated there was electrophysiologic evidence of severe left median neuropathy at her left wrist, "suggestive of left carpal tunnel syndrome of severe intensity."  *Id.*

On May 9, 2019, Smith met with neurologist, Lingling Rong, M.D., M.S. (Tr. 1885-1903).  After reviewing her prior testing and physical examination, Dr. Rong noted that Smith was, generally, normal and had 4 out of 5 grip strength in her left arm. (Tr. 1895-1901).  He also noted that she had decreased sensation to temperature and pinpricks on

the first three fingers on her left hand and on the median side of her fourth finger but had intact joint position sense. (Tr. 1902). He instructed her to splint her hand at night, use lidocaine cream or pain relievers, and referred her to an orthopedic doctor. *Id.*

On May 6, 2019, Smith had a therapy session, reporting pain that was 5 out of 10; the therapist noted she tolerated the treatment and showed improvement. (Tr. 504-506).

On May 9, 2019, Smith saw Dr. Rong. (Tr. 1961). A review of her symptoms did not indicate anything abnormal about her left hand, nor did Dr. Rong identify anything in her physical examination, aside from 4 out of 5 grip strength. (Tr. 1967). He also noted that she had intact joint position sense and decreased sensation to temperature and pinpricks on her first to third fingers and the median side of her fourth finger on her left hand. (Tr. 1968). He instructed her to continue using the lidocaine cream and to see an orthopedic surgeon. (Tr. 1969).

On May 10, 2019, Smith had a therapy session, reporting pain that was 6 out of 10; the therapist had the same notations regarding her tolerance and response. (Tr. 2217, 2220).

On May 20, May 24, and May 28, 2019, Smith had occupational therapy. (Tr. 2265, 2269, 2273). She reported pain that was 6 out of 10 in her left hand but noted in one session that she suspected she was getting used to the pain. (Tr. 2266, 2269, 2273). During the May 25 session, she described the pain as feeling like her fingers were going to explode. (Tr. 2269). The therapist noted that she tolerated the therapy well and was improving. (Tr. 2268, 2272, 2276).

On May 30, 2019, Smith was seen at Northwest Ohio Orthopedics and Sports Medicine, and she complained of pain and numbness in her left thumb, index finger, and middle finger. (Tr. 2085). Smith reported that the pain was constant, sharp, burning, dull, and aching. *Id.* She rated it as 6 out of 10 but noted it worsened with use. *Id.* She also noted that pain medication did not provide significant improvement. *Id.*

6

On physical examination, Smith was noted to have "[g]rossly normal" range of motion in her left wrist with "minimal pain at [the] terminal flexion," tenderness at one joint but no evidence of wrist instability, and was negative on a carpal compression test.  (Tr. 2088).  It was also noted, however, that she had 4 out of 5 grip strength with motor function intact distally and decreased sensation to light touch.  *Id.*  Additional imaging showed that her left wrist had normal alignment with intact joint spaces, minimal degenerative changes with sclerosis of radiocarpal joints, and no significant degenerative or erosive changes.  *Id.*  She was diagnosed with carpal tunnel syndrome and, after discussing various long-term treatment options, was provided with a lidocaine injection.  *Id.*

On May 31, 2019, Smith had therapy, reporting pain of 6 out of 10 in her left hand; the therapist noted that she tolerated the session well and was improving.  (Tr. 2281, 2284).

On June 1, 2019, Smith returned to the hospital to receive surgical clearance for a carpal tunnel release procedure.  (Tr. 2026).  Regarding her left hand, it was noted that the pain had been constant but was gradually getting worse.  *Id.*  She described the pain as burning, aching, and sharp with a severity of 7 out of 10.  *Id.*  Relatedly, she had an inability to bear weight, limited range of motion, numbness, and stiffness.  *Id.*  She did not have joint locking, swelling, or tingling, but her symptoms were aggravated by activity.  *Id.*  On physical examination, she was generally normal, but for a decreased range of motion and tenderness in her left wrist.  (Tr. 2029-2030).  She was assessed with left hand carpal tunnel syndrome.  (Tr. 2031).

On June 11, 2019, Smith saw Dr. Rong.  (Tr. 1942-1948).  On physical examination, she was noted as being normal and her left hand was neurologically normal, including its strength.  (Tr. 1947).  It was noted that she had normal sensitivity to light touch, temperature, pinpricks,

vibration, and intact joint position sense.  *Id.*  He instructed her to follow up with her orthopedist and to continue with the lidocaine cream or pain relievers and using a splint.  (Tr. 1948).

On June 13, 2019, Smith returned to her orthopedist.  (Tr. 2095).  Smith reported that she did not receive any relief from the injection and there had been no change in her numbness or tingling.  *Id.*  She indicated her pain was aching and 5 out of 10, the pain increased with use, she had decreasing grip strength, and she would drop things.  *Id.*  On physical examination, the orthopedist noted that her left wrist had grossly normal range of motion with minimal pain, there was tenderness over one finger joint, but there was no evidence of wrist instability.  (Tr. 2098). The orthopedist indicated her grip strength was 4 out of 5 with motor function intact distally, and she had decreased sensation to light touch.  *Id.*  The orthopedist again reviewed possible treatments and Smith stated she would like to proceed with a surgical release.  *Id.*

On July 8, 2019, Smith underwent a carpal tunnel release, performed by Darin Nye, M.D. (Tr. 2113).  No complications were reported.  (Tr. 2114).

On July 10, 2019, Smith had a follow-up appointment at the Northwest Ohio Orthopedic center and reported that her pain was 5 out of 10, aching, and constant.  (Tr. 2116).  She reported continued numbness primarily in her index finger.  (Tr. 2117).  She was given exercises to increase her range of motion and diagnosed with numbness and pain.  (Tr. 2118-2120).  It was noted that she needed continued occupational therapy to increase her range of motion, strength, and ability to perform activities of daily living.  (Tr. 2119-2120).

From July 15 to August 5, 2019, Smith had six therapy sessions.  (Tr. 2123-2147).  When noted, Smith described her pain as being 0 out of 10 and that she struggled with the desensitization program or had pain, numbness, or tingling.  (Tr. 2123, 2126, 2136, 2143).  She also occasionally reported that holding things was more difficult or she was not able to sleep all

8

night without pain, and the pain was worse since her last appointment.  (Tr. 2126, 2136, 2140).

The therapist generally noted that Smith experienced numbness rather than pain, completed her

range of motion exercises without difficulty, and her condition was unchanged.  (Tr. 2124, 2127,

2129-2130, 2135).  During one session, the therapist observed that Smith's greatest deficit was in

her hypersensitivity, she had lost protective sensation in her index and longer finger, and only

had diminished sensation in her thumb.  (Tr. 2135).  In another session, the therapist noted that

Smith had hyperalgesia, mild tenderness on her index finger, and 4 out of 5 grip strength.

(Tr. 2139).

On August 6, 2019, one month after her carpal tunnel release procedure, Smith was seen

at her orthopedist's office.  (Tr. 2149).  She reported only mild improvement, despite her

therapy, and indicated she had continued numbness and tingling in the first three fingers of her

left hand, weak grip strength, and 5 out of 10 pain, which worsened with increased use.

(Tr. 2149).  On examination, Smith was noted to have grossly normal wrist motion, with

minimal pain when flexing, and normal motion in two of her index-finger joints.  (Tr. 2152).  It

was also reported that the hyperalgesia of her index finger had improved, she had 4 out of 5

strength with motor function intact distally, and she had decreased sensation to light touch in her

index finger.  *Id.*

On August 12, August 19, and August 26, 2019, Smith had additional therapy sessions

and reported that her pain was 5 to 6 out of 10.  (Tr. 2154-2164).  Her complaints were,

generally, the same, noting numbness or increased pain with activities.  *Id.*  On one occasion, she

did note that her index finger had improved.  (Tr. 2164).  The therapist noted that her condition

was the same, but that she did show increased grip strength.  (Tr. 2155-2156, 2158, 2162).

On September 3, 2019, Smith saw Dr. Nye and reported the same constant pain (5 out of 10).  (Tr. 2166).  On physical examination, Dr. Nye noted that Smith had full wrist and digital range of motion, without any focal tenderness, 4 out of 5 grip strength with motor function intact distally, and decreased sensation to light touch over her index and long fingers.  (Tr. 2169).  His impression was that "aside from diminished sensation, [Smith's] exam [was] normal."  *Id.*

On September 9, September 30, and October 9, 2019, Smith had additional therapy sessions.  (Tr. 2170-2171, 2370-2375).  Generally, Smith's reported symptoms remained the same, but on her first appointment she did not report any pain stating it was "more like discomfort" that she had grown accustomed to.  *Id.*  On September 30, Smith stated that she did not plan to go back to work because her back pain was so bad that she could not stand for long, her hand was numb, and she continued to have sensory deficits.  (Tr. 2374).  The therapist noted that Smith said she did not rub her hand against fabric at home because of a noxious feeling. (Tr. 2375).  Otherwise, the therapist noted Smith's frustration or that her condition had not substantially changed but her grip was "a little better."  (*See* Tr. 2171-2172, 2373, 2375).

On October 30, 2019, Smith had a therapy session, during which she reported that her pain was 8 out of 10 and that she was experiencing increased achiness in her palm.  (Tr. 2364).  She reported that her numbness and tingling continued in her fingers and her index finger was worse because the entire finger was numb.  *Id.*  She also indicated that her long and ring fingers were numb at the tips but gained sensation towards her palm.  *Id.*  The therapist assessed that she had impaired pain, muscle strength, and range of motion associated with her hand numbness and pain, which created functional limitations in her activities of daily living.  (Tr. 2366).

On November 5, 2019, Smith saw Dr. Nye for a follow-up appointment after her carpal tunnel surgery and reported that she did not feel any better.  (Tr. 2359).  She indicated she had

10

continued numbness and tingling in her index and long fingers with pain that was aching and 5 out of 10. *Id.* On examination, Dr. Nye noted that she had full wrist and finger range of motion in her left hand, no focal tenderness, the joints were stable, she had 5 out of 5 grip strength with motor function intact distally, and she had decreased sensation to light touch over her index and long fingers. (Tr. 2362). Dr. Nye noted that the EMG testing from April 30, 2019 indicated severe left median neuropathy, but his impression was that Smith had carpal tunnel syndrome and, because of her lack of improvement after the release procedure, he recommended a repeat EMG test. *Id*.

On November 13, 2019, Smith was seen by Susan Hubbell, M.D., regarding her hand. (Tr. 2435-2437). Smith reported that she had pain in her left thumb, index finger, and long finger and, in the last 24 hours, it had ranged from a 2 to 8 out of 10, with the average being 4 out of 10. (Tr. 2436). She described the pain as being aching, sharp, nagging, throbbing, numb, dull, and burning. *Id.* She felt that her pain severely interfered with her normal work and enjoyment of life, and moderately interfered with her general activities and mood. *Id.* On physical examination, Dr. Hubbell noted that Smith's left thenar eminence muscle had strength that was 4 out of 5 and her movement was 5 out of 5, except that she had difficulty flexing her left index finger voluntarily. *Id.* After reviewing a second EMG test that had been done, Dr. Hubbell assessed that Smith's abnormal electrodiagnostic testing was consistent with a partial injury to the left median nerve and "[s]he [was] at risk to have critical illness neuropathy due to her prolonged time on the ventilator. . . It appears that she has more than one injury to the median nerve." (Tr. 2436-2440). She recommended that Smith consider an MRI or ultrasound of her nerve to see whether there was any other injury to the nerve or anything compressing the nerve. (Tr. 2437).

11

On November 21, 2019, Smith saw Dr. Nye, reporting the same pain.  (Tr. 2501).  His physical examination was largely the same, except he noted that she had 5 out of 5 grip strength. (Tr. 2504).  After noting Dr. Hubbell's interpretative results, Dr. Nye still included carpal tunnel syndrome in his impressions, but he also noted left median neuropathy and recommended that Smith either undergoing an MRI or have a musculoskeletal ultrasound.  *Id.*

On November 26, 2019, Smith had an MRI conducted on her left median neuropathy. (Tr. 2494).  Its findings indicated that she had median neuropathy in her left arm.  *Id.*

On December 2, 2019, Smith saw Dr. Nye, reporting continued numbness in median nerve distribution of her left hand and 5 out of 10 aching pain in her left hand.  (Tr. 2496).  On examination, Dr. Nye observed that she had full wrist and digital range of motion, no focal tenderness, and a negative carpal tunnel compression test.  (Tr. 2499).  She also had 4 out of 5 grip strength with motor functional intact distally, and in two tendons of her index finger.  *Id.*  It was further observed that she had decreased sensation to light touch over her index and long fingers.  *Id.*  Dr. Nye's assessment was that she had left median neuropathy, and he recommended further evaluation by a neurologist.  (Tr. 2500).

On December 12, 2019, Smith had a follow-up appointment with Dr. Rong.  (Tr. 2473). She reported that her main complaint was with her left forearm; left first finger numbness, tingling, and pain; and intermittent tingling, numbness, and pain in the first three and a half fingers of her left hand.  (Tr. 2474).  She also reported that, after her carpal tunnel release, her symptoms worsened, with the pain in her left fingers becoming constant at 5 to 7 out of 10 and sensitive to heat and cold.  *Id.*  On examination, Dr. Rong observed that Smith had decreased strength in her left-hand grip (4 out of 5) and left index finger flexion (3 out of 5) but otherwise had normal strength.  (Tr. 2479).  He observed hypersensitivity to pain on her left-hand ulnar

distribution; a decreased sensation to temperature in her thumb, index finger, and long finger; and decreased sensation to touch and temperature on her left forearm.  *Id.*  He referred Smith for an MRI and recommended trying an over-the-counter topical treatment.  (Tr. 2480).

On December 26, 2019, Smith saw Dr. Nye.  (Tr. 2489).  She reported that she continued to have pain in her left thumb, index, and long fingers that was 5 out of 10.  *Id.*  On physical examination, Dr. Nye noted that Smith had full wrist and digital range of motion, no focal tenderness, and had a negative carpal tunnel compression test.  (Tr. 2492).  She also had 4 out of 5 grip strength with motor functional intact distally and 4 out of 5 strength in two of her index finger's tendons.  *Id.*  He observed that she had decreased sensation to light touch over her index and long fingers.  *Id.*  Dr. Nye assessed her with left median neuropathy and was offered a referral for a specialist for suspected critical illness neuropathy.  (Tr. 2493).

On March 10, 2020, Smith saw Peter Robinson, M.D. at the Ohio State Neurology Clinic. (Tr. 2484).  He reviewed her complaints about her left hand and, on physical examination, noted that she had a reduction of 5- out of 5 in the flexion of her fourth and fifth fingers, extension of all four fingers, and opposition and flexion in her thumb, and 4 out of 5 reduction in the flexion of her second and third fingers.  (Tr. 2486).  Her reflexes were normal.  *Id.*  Dr. Robinson noted that she also had decreased sensation to light touch and pinpricks in her left median distribution and only a "possible slight decrement" to vibration in the same.  (Tr. 2487).  He noted that the EMG conducted for Dr. Hubbell showed multiple median nerve injuries, consistent with a history of critical illness neuropathy.  *Id.*

Dr. Robinson assessed Smith with left side median neuropathy and not carpal tunnel, stating:

> I have little to offer but it is reasonable to conduct Neuromuscular ultrasound of LUE looking for sites of compression in median nerve either proximal or distal to carpal

tunnel... In principle, this could lead to intervention, though I was very clear to her that this was not the most likely outcome and that this was more likely to confirm that no surgical intervention was likely to be helpful.

*Id*. He discussed the possibility of medication or therapy, but she was not interested, and he recommended dietary changes to encourage nerve health. *Id.*

On June 19, 2020, Smith underwent a neuromuscular ultrasound of her left hand. (Tr. 2859). It showed that "[t]he left median nerve was normal in appearance." (Tr. 2860).

### C.     Relevant Opinion Evidence

On June 10, 2019, Diane Manos, M.D., assessed Smith's functional limitations based on a review of the medical evidence. (Tr. 181-184). As to Smith's manipulative limitations, Dr. Manos found that Smith was unlimited in her reaching and handling but was limited in her fingering and feeling on her left hand. (Tr. 182-183). Specifically, she found that Smith was limited to frequently using the extremity because of the severe left median neuropathy suggestive of carpal tunnel syndrome. (Tr. 183). On September 18, 2019, David Knierim, M.D., reconsidered Smith's functional limitation and found that she was unlimited in her reaching but was limited to frequently handling, fingering, and feeling with her left hand due to her status post-carpal tunnel release. (Tr. 198, 200).

### D.     Relevant Testimonial Evidence

#### 1.     Tanika Smith

Smith testified at the hearing. (Tr. 40-57). She explained that she lived with her husband and nephew, and her husband took care of their expenses. (Tr. 40-41). She stated she was right-handed, obtained a GED, and did not have any other specialized training. (Tr. 41-42). Although she could drive, she explained that her right hand did not fully account for the limited abilities of her left hand, which made it difficult. (Tr. 42). She did, however, drive herself if she needed to

go anywhere.  *Id.*  For her past work as a convenience store associate, she thought she lifted between 40 to 50 pounds and was on her feet the entire shift and, as a manager, she thought she lifted items of the same weight and would split an eight-hour shift between sitting and standing. (Tr. 43-44).  Smith testified that the physical health reason she could not work was because of her lack of sensation, feeling, and grip in her left hand, which made it difficult for her to pick things up, deal with hot items, count money, or work on the computer.  (Tr. 45).  She also stated that she did not have the strength to lift and restock shelves.  *Id.*

Smith explained that she was seeing a cardiologist, an endocrinologist, a neurologist, and had been seeing an orthopedist; the neurologist and orthopedist were specifically for her left hand.  (Tr. 46).  Regarding her left-hand pain, Smith testified that it was persistent in her thumb, index finger, and long finger, with "nothing mak[ing] it better."  *Id.*  She reported trying medication and therapy but indicated the exercise or use of the fingers made her condition worse. (Tr. 46-47).  She could lift about 10 pounds with her left hand.  (Tr. 47).  How she typically spent her day varied based on how she was feeling because some days she could not get out of bed but others she would get up, eat breakfast, try to do some light housework, but would do so with breaks for sitting down.  (Tr. 47-48).  She would do cooking and mopping and use a dishwasher.  (Tr. 48).  She would also use her phone to scroll through social media on a daily basis, but she did not have games on it.  (Tr. 48-49).  She believed she could do a job that required sitting down all day to sort nuts and bolts, so long as the two were not threaded together, because she could not use her left hand to separate them.  (Tr. 49-50).

Smith testified that the problems with her left arm started after she was in the hospital for her heart.  (Tr. 52).  She explained that her left hand caused her to have difficulty with fastening or unfastening buttons, unhooking her bra, and tying shoelaces.  (Tr. 52-53).  When she drank

15

something, like a can of soda, she would hear the sounds of her grip on the can to tell she had a good enough grip on it.  (Tr. 53).  The carpal tunnel release surgery she had undergone did not help at all, and she explained that she believes her left-hand limitations arose as a complication from having been on a ventilator for two and a half to three weeks while hospitalized.  *Id.*  She stated that her pain did not improve with use, but she could use her hand for about an hour or two, across an entire day, until it would start feeling swollen and stiff.  (Tr. 56-57, 65).

### 2.      Vocational Expert

Gail Klier, a vocational expert, testified at the hearing.  (Tr. 57-67).  The VE testified that a hypothetical individual of Smith's age, experience, and with the ALJ's proposed limitations, including a limitation to sedentary work and only frequent handling and fingering with her left hand, could perform work in the national economy.  (Tr. 60-61).  If the limitations were altered to use of only one hand with the remaining limitations staying the same, the VE testified that the limitation would be work preclusive.  (Tr. 61-62).  Additionally, the VE testified that the frequent use of both hands was required for all light or sedentary jobs.  (Tr. 63).  However, in differentiating between frequent and occasional use with respect to the time spent using their hands, the VE testified that a minimal reduction, such as five minutes less than what "frequent use" would not eliminate the available jobs.  (*See* Tr. 63-64).

## III.   Law & Analysis

### A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.

16

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

B.     **Step Four: Residual Functional Capacity**

Smith contends that the ALJ misevaluated her RFC limitations for fingering and handling with her left arm because the limitation to only frequent fingering and handling was not supported by substantial evidence.  ECF Doc. 10 at 15.  Smith argues that the ALJ discounted the evidence, which would have supported a greater limitation, based on her analysis of a single ultrasound study that showed normal findings.  But Smith asserts that this was an inaccurate

understanding of the ultrasound's results.  And she argues that the ALJ failed to discuss or credit material facts from July 2019 treatment notes and notes of Drs. Hubbell, Rong, Nye, and Robinson, which supported a diagnosis of critical illness neuropathy and more restrictive manipulative limitations.  ECF Doc. 10 at 15-21.  Because the ALJ omitted these opinions, Smith asserts that the ALJ's assessment that her subjective symptom complaints about her left hand were inconsistent with the medical evidence was also erroneous.  ECF Doc. 10 at 19-20.[2]

The Commissioner disagrees.  ECF Doc. 13 at 5-10.  In her reply brief, Smith largely reiterates her arguments.  ECF Doc. 15 at 1-6.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

---

[2] Smith also contends that the ALJ's Step Two determination was erroneous, asserting the ALJ erred by not including critical illness neuropathy as a severe impairment.  *See* ECF Doc. 10 at 18, 21.  First, the court need not review Smith's contention because she raises it only in the most cursory manner without any substantive argument.  *See Rice v. Comm's of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997)).  Further, even if properly raised, any error by the ALJ would be harmless because the ALJ found other severe impairments and assessed Smith's limitations based on her left hand, as discussed below. *See Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (noting that so long as the ALJ considers all the claimant's impairments in the other steps, any Step Two error is harmless).

Relevant evidence also includes the claimant's subjective symptom complaints. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability."). Generally, an ALJ must explain whether she finds the claimant's subjective complaints consistent with objective medical evidence and other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (noting that the ALJ must clearly explain her reasons for discounting subjective complaints).  In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate her symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4, at *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining if his testimony regarding his pain was credible).

Although a close question, I find that the ALJ applied the proper standards in assessing Smith's manipulative limitations and reached a decision supported by substantial evidence, or harmlessly erred in doing so.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Smith cites a variety of notes that she contends the ALJ omitted.  However, Dr. Robinson's note is distinct from the others because the ALJ's summary of the medical evidence indicates that those records were considered, unlike Dr. Robinson's.  (*See* Tr. 16-26).  The ALJ's summary of the evidence related to the medical condition Smith's left hand was skimpy at best.  Despite its brevity, however, the ALJ: (i) noted occupational therapy records from July 2019, contained in Exhibit 13F, that discussed her desensitization, (*see* Tr. 2123-2147); (ii) noted Smith's continued reports of symptoms after her carpal tunnel surgery, including a citation to one of Dr. Nye's notes, (*see*

Tr. 2359); (iii) cited Dr. Hubbell's evaluation of Smith's EMG testing, (Tr. 2435, 2440);

(iv) cited Dr. Nye's records from December 26, 2019, (Tr. 2495); and (v) cited an exhibit which

included notes from Dr. Rong (Tr. 1882).  (*See* Tr. 23).  Because the ALJ demonstrated that she

considered those records or cited to the exhibits containing them, no further specificity in the

citations or summary of the medical evidence was required.  *See* 20 C.F.R. §§ 404.1520(e),

416.920(e); *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 195 (6th Cir. 2020) ("An ALJ

need not discuss every piece of evidence in the record for [the ALJ's] decision to stand.")

(internal quotation marks omitted)  Moreover, the ALJ decision contained the boilerplate

representation that the ALJ gave "careful consideration to the entire record" before making her

RFC findings.  (Tr. 21).

The omission of Dr. Robinson's record creates a more concerning problem.  In evaluating

the RFC, an ALJ must base her determination on "the record in its entirety."  *See Rodgers v.*

*Comm's of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (noting that, although the substantial

evidence standard is deferential, it is limited by the requirement that all determination be based

on the record in its entirety).  Without any reference to Dr. Robinson's medical record or even a

citation to the general exhibit in which it was found, the court has no way – other than trusting

the foregoing boilerplate representation – of assuring itself that the ALJ was even aware of it.

But an important caveat exists that sheds light on the tension between the ALJ's responsibilities

in considering the entire record and reflecting that consideration in her decision.  A panel of the

Sixth Circuit has explained that "[w]hile an ALJ is not required to discuss every piece of medical

opinion evidence," a reversible error can occur when the ALJ "[does] not nearly discuss enough

of the evidence to enable [a reviewing court] to determine whether substantial evidence supports

the determination that [the claimant's] impairments do not render her disabled." *Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 753 (6th Cir. 2011).

And district courts have followed this distinction, finding reversible error when the ALJ has failed to acknowledge a *large* number of records relevant to the ALJ's findings. *See Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 437-38 (6th Cir. 2013) (vacating an ALJ decision because the ALJ "did not consider a large portion of the objective medical evidence"); *Stidom v. Comm'r of Soc. Sec.*, No. 5:21-cv-211, 2022 U.S. Dist. LEXIS 93396, at *44-46 (N.D. Ohio May 10, 2022) (recommending the claim be remanded for the ALJ's failure to discuss and mischaracterization of the claimant's complaints that related to the ALJ's adopted limitations); *Tjaden v. Saul*, No. 3:20-cv-00025, 2021 U.S. Dist. LEXIS 32526, at *14-16 (S.D. Ohio Feb. 2, 2021) (remanding an ALJ's decision for failing to even acknowledge a large number of physical therapy observations incompatible with the ALJ's RFC limitations).

That leads us to the question of whether Dr. Robinson's lone record was sufficiently material that the ALJ's failure to mention it created an insurmountable barrier to meaningful review. Although a single note, Smith asserts that Dr. Robinson's record was contrary to the ALJ's analysis of her ultrasound results, which the ALJ concluded was contrary to the other records bearing upon her left-hand limitations. *See* ECF Doc. 10 at 17-18; (Tr. 23-24 ("However, an ultrasound of the left arm in June 2020 demonstrated normal appearance of the left median nerve.")). And this would pose a problem because, in addition to considering the entire record, the ALJ has the responsibility to resolve conflicts in the evidence. *See Stidom¸* 2022 U.S. Dist. LEXIS 93396, at *42.

However, Smith's contention overreads Dr. Robinson's note in two important regards. First, Smith asserts that Dr. Robinson "diagnosed" her with critical illness neuropathy. This is

not the case.  Dr. Robinson merely articulated that her treatment history was "consistent with" the condition.  (*See* Tr. 2487).  In fact, contrary to what Smith asserts, neither Dr. Hubbell nor Dr. Nye diagnosed her with the condition either.  (*See* Tr. 2436-2437, 2493).  Second, Dr. Robinson's treatment note cannot properly be described as an interpretation of the ultrasound, as Smith argues.  *See* ECF Doc. 10 at 17-18.  Dr. Robinson saw Smith prior to the neurological ultrasound, specifically stating:

> [I]t is reasonable to conduct a Neuromuscular ultrasound of [left upper extremity] looking for sites of compression. . . . In principle, this could lead to intervention, though I was very clear to her that this was not the most likely outcome and that this was more likely to confirm that no surgical intervention was likely to be helpful.

(Tr. 2487).  From this, it would appear that Dr. Robinson wanted to investigate whether Smith's median nerve was compressed but seemed to believe in advance of the study that surgical intervention was not the most likely outcome.  This record does constitute an opinion of Dr. Robinson that he anticipated the ultrasound would return normal results or any specific abnormal result.  Rather, Dr. Robinson's opinion best reflects his impression that the ultrasound would be unlikely to support a recommendation for surgical intervention.  Little about Dr. Robinson's statement can truly be said to reflect what if any limitations Smith had on the use of her hands.  Further, in comparison to the other approximately 2500 pages of records and the numerous other physical and mental conditions the ALJ considered, the failure to refer to a single vague record does not create the same type of concern that could give rise to a reversible error.  *See Karger*, 414 F. App'x at 753; *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result." (citations omitted)).

Moreover, the ALJ's manipulative limitations were supported by substantial evidence. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Such evidence includes: (i) treatment records indicating good toleration of treatment, consistent progress, and/or improvement in Smith's condition (Tr. 398, 506, 514, 519, 524, 528, 533, 534, 537, 539, 543, 547, 552, 554, 560, 563, 565, 2220, 2268, 2272, 2276, 2284); (ii) treatment notes consistently identifying Smith's strength and/or range of motion as normal or only minimally reduced, (Tr. 571, 1895-1901, 1967, 2088, 2098, 2139, 2152, 2155-2156, 2158, 2162, 2169, 2362, 2436, 2479, 2492, 2499; (iii) therapist notes indicating that Smith experienced numbness or loss of sensation rather than pain, (Tr. 2124, 2127, 2129-2130, 2135, 2169); (iv) Smith's own testimony that she could drive a car, could lift 10 pounds, cook, mop, do dishes, and could sort nuts and bolts, as long as they were not threaded together, (Tr. 42, 47, 48, 49-50); and (v) the state agency consultants' opinions who both found Smith was limited to frequent handling, fingering, and feeling, (Tr. 182-183, 198). *Biestek*, 139 S. Ct. at 1154.

As part of her argument for remand, Smith contends that the ALJ erred in finding her subjective symptoms complaints inconsistent with the medical record because the ALJ overly relied on her normal ultrasound finding and omitted the above-referenced records.  ECF Doc. 10 at 18-19.  She does not otherwise challenge the ALJ's noted inconsistencies with her subjective symptom complaints.[3]  As discussed above, the majority of the notes Smith alleges were omitted from the ALJ's discussion were in some manner referenced by the ALJ such that we can determine the ALJ reviewed them.  The omission of Dr. Robinson's opinion did indicate greater

---

[3] It should be noted that the ALJ identified Smith's daily phone usage for going on social media as being inconsistence with her subjective complaints (*see* Tr. 22); this is dubious at best.  But as Smith has not contested the finding on that ground, we will not further review it.  "[I]t is not the Court's function to search the . . . record for evidence to support [the plaintiff's] 'argument' or find law supporting [her] claims."  *See Jones v. Comm'r*, No. 3:12-CV-2986, 2013 U.S. Dist. LEXIS 126077, at *19 (N.D. Ohio July 30, 2013).

limitations in her flexion and extension, which is concerning.  (*See* Tr. 2486).  But Dr. Robinson did not provide any interpretation of those how those limitations might impact Smith's ability to function, and the ALJ provided independent justifications for finding Smith's subjective complaints to be inconsistent, relying, in part, on the inconsistencies in Smith's testimony.  (*See* Tr. 22).  As a consequence, to the extent Smith contests the notes discussed by the ALJ, she effectively asks that the court reweigh the ALJ's evaluation of the evidence and its consistency with her complaints.  This we cannot do.  *See Jones,* 336 F.3d at 476; *see also Piehl v. Comm'r of Soc. Sec.*, No. 21-11066, 2022 U.S. Dist. LEXIS 95124, at *17 (E.D. Mich. May 4, 2022) (finding that because the ALJ properly considered the medical evidence in reaching the RFC, the claimant's challenge to the ALJ's subjective complaint finding, which the ALJ supported with medical evidence, in effect called for the court to reweigh the evidence).  And because the ALJ justified the inconsistency finding based on the internal contradictions of Smith's own testimony, Dr. Robinson's note would not alter that evaluation.  *See Fisher,* 869 F.2d at 1057.

Accordingly, because the ALJ's RFC finding was supported by substantial evidence, it fell within her "zone of choice" and cannot be second-guessed by this court.  *Mullens v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).  The ALJ's decision must be affirmed.

## IV.     Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, or harmlessly erred in doing so, the Commissioner's final decision denying Smith's applications for DIB and SSI is affirmed.

**IT IS SO ORDERED.**

Dated: June 30, 2022

Thomas M. Parker
United States Magistrate Judge

24